In re The **PRUDENTIAL ENERGY COMPANY, the Prudential Group, Inc., Debtors.**

**Bankruptcy No. 84 B 10632–33.**

United States Bankruptcy Court, S.D. New York.

March 19, 1986.

As Corrected March 24, 1986.

See also, 59 B.R. 765.

Shea & Gould, New York City, for debtors; Herman A. Bursky, Eric P. Wainer, Michael E. Emrich, of counsel.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Creditors' Committee; Scott L. Hazan, Steven B. Soll, Steven M. Fuhrman, of counsel.

Weil, Gotshal & Manges, New York City (Edward C. Sobota, of counsel), Matthews & Branscomb, San Antonio, Tex. (Robert D. Rooney, of counsel), for MBank Alamo, N.A.

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Debtors, the Prudential Energy Company ("PEC") and the Prudential Group, Inc. ("PGI") (the "Debtors"), each filed petitions on April 26, 1984 seeking to reorganize themselves pursuant to Chapter 11 of

the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* (1984) (the "Code"). An Official Committee of Unsecured Creditors (the "Committee") was appointed soon thereafter to represent all unsecured creditors. An order approving the Debtors' Second Amended Disclosure Statement (the "Disclosure Statement") pursuant to § 1125 of the Code was entered on January 6, 1986. The Debtors, with the support of the Committee, now seek confirmation of their Second Amended Joint Plan of Reorganization (the "Plan") pursuant to § 1129(a) of the Code. Hearings were held on February 14 and 24, 1986.

## I.

PGI is incorporated under Delaware law. PEC, formerly known as the Seneca Oil & Gas Company, is a subsidiary of PGI. It owns oil and gas interests jointly with participants in exploration and development programs. It further owns approximately 53.3% of a limited partnership, Plaza Income Partnership ("PIP"). Nine days before it filed for reorganization, PEC resigned as general partner of PIP and a company wholly owned by one Nathan M. Shippee was elected as general partner. Shippee was and is president of the Debtors.

PEC's assets stand as collateral for repayment of loans made to it by Alamo National Bank, now known as MBank Alamo, N.A. As of the petition date, some $14 million in loans were outstanding. Pursuant to a post-petition agreement approved by this court on May 11, 1984, MBank was granted a priority claim against each of these estates secured by a senior lien on unsecured property and a junior lien on secured property to the extent that funds were advanced by MBank to the particular estate. According to the Disclosure Statement, p. 5, only PEC obtained advances from MBank. Those advances totalled $5 million and at the same time the pre-petition debt owed to MBank by PEC was reduced to $7.8 million. The Debtors do not assert any equity in the collateral.

In addition to the MBank claims and tax claims, the PEC debt structure consists of holders of mechanics liens (class 3), general unsecured creditors (class 4), claims of entities in which PEC was or is a partner or shareholder (class 5), claims of holders of debentures, issued by Seneca in 1977 (class 6), and intercompany claims (class 7). The debentures are non-transferable and, by their terms, subordinated to senior indebtedness which is defined to consist of sums borrowed from banks and financial institutions.

PGI, since at least 1977, has acted as a holding company. Its operating subsidiaries are primarily involved in oil and gas through PEC, and minimally in the art business through Shippee Galleries, Inc. and Prudential Properties, Inc., which in turn owns a subsidiary known as Old Lyme Art Works, Ltd. The PGI debt structure parallels that of PEC and the claims in the PGI estate are classified with those in the PEC estate. PGI issued 10% Subordinated Debentures in 1983, in an aggregate amount of $4,724,572, in exchange for 277,-916 shares of PGI common stock. PGI's obligation to MBank arises from a guaranty of the PEC indebtedness rather than from borrowing by PGI. The subordination clause of the PGI debenture agreement apparently speaks in terms of loans made to PGI and the Disclosure Statement, p. 11, states that

> The PGI Debentures are subordinate to "Senior Indebtedness" which was defined to mean any and all indebtedness, obligations and liabilities incurred for money borrowed from banks ... and other financial institutions.

There is no indenture trustee for the PGI debentures.

In assessing the alternatives to reorganization under the joint Plan of Reorganization that they propose, the Debtors proffer liquidation analyses for both companies. As to PEC, they state that its assets have estimated values totalling $8.7 million as against the MBank secured claim and priority claims of approximately $12.3 million, leaving nothing for unsecured creditors.

With respect to PGI, a sum of $750,168.25 is estimated to be available for distribution to unsecured creditors. That sum is reached by assigning to PGI assets a value of $1.585 million as against priority claims of $835,000.

Notwithstanding the surplus in the PGI estate, the claims in both estates are treated alike in the Plan. Each unsecured creditor, under certain assumptions, is to receive cash equal to 15% of its allowed claim and 7.14 shares of new PGI stock per $100 of allowed claim. In addition it will receive a pro rata share of proceeds from certain other assets and causes of action.[1] Each holder of PGI or PEC debentures is to receive 5.81 shares of new PGI stock for each $100 of debentures and shareholders are to receive .538 shares for each share of PGI stock. The debentures and currently outstanding shares are to be cancelled as of the confirmation date.

No valuation of new PGI stock was offered. Upon confirmation PEC's assets would be sold and PEC merged with PGI. PGI would be left in the art business, and in the business of facilitating investments in new oil and gas partnerships, and providing management services to PIP and three other existing funds. No revenues are projected from the art business. For 1986, revenues from providing management services to those four funds are projected in the Disclosure Statement at $341,941. Annual expenses, including $50,000 for audit fees and $24,000 for legal fees, total $566,172. The Debtors, nevertheless, assert that they will earn a profit as a result of forming new limited partnerships with a total capitalization of $3 million and receiving a 10% fee ($300,000) for doing so, and charging those new partnerships a management fee of $24,000.[2] In 1987 and the four

---

**1.** At the hearing on confirmation, it was stated that one of these causes of action consists of a claim to be brought against the holders of PGI debentures on fraud grounds in connection with the issuance of the PGI debentures. The fraud claim was not spelled out. Sixty percent of the proceeds, if any, from that suit, are to be paid to the other unsecured creditors. No holder of PGI debentures was appointed to the Committee. The Committee and its counsel, conceeding their responsibility to represent the PGI deben-

tureholders as well as other unsecured creditors, offered no explanation for their negotiation of and agreement to a plan whereby one part of their constituency is to benefit from a suit to be brought against a group that they have the fiduciary duty to represent.

**2.** The Debtors' pro-forma projected income statement for the year ending December 31, 1986, in abbreviated form, is as follows:

| | | |
|---|---:|---:|
| Revenues | | |
| Mgmt. Fees from Plaza Income Partnership | | $269,941 |
| Mgmt. Fees from other funds and programs | | $ 72,000 |
| Organization Fees from forming new limited partnerships at 10% of total capitalization of partnerships | | $300,000 |
| Mgmt. Fees from New Partnerships | | $ 24,000 |
| Total Revenues | | $665,941 |
| Operating Expenses | | |
| Salaries & Wages | | |
| N.M. Shippee | $120,000 | |
| Others | $132,000 | |
| Total Salaries & Wages | | $252,000 |
| F.I.C.A. @ 7.05% to $39,600 per Annum | | $ 11,012 |
| Other Taxes & Employee Benefits @ 8.0% | | $ 20,160 |
| Audit Fees | | $ 50,000 |
| Legal Fees | | $ 24,000 |
| Stock Transfer Charges | | $  3,600 |

years thereafter, new partnerships of $5 million per year are projected, generating commissions of $500,000 annually. Management fees on these unidentified partnerships to be formed are projected to bring in revenues totalling $48,000 in 1987, $72,000 in 1988, $96,000 in 1989, $120,000 in 1990, and $144,000 in 1991.

At the hearing, however, it was revealed that the debtors formed no new partnerships in 1985 and in 1984 found investment committments of only $2.1 million for such partnerships. The Disclosure Statement did not contain these obviously material facts. Neither did it reveal that no prospects have entered into contracts to make such investments after confirmation, nor that no projects have been established in which such investments could be made. Notwithstanding that lack of revenue producing activity, the Debtors assert that their projections are reasonable based in part on their historic sales figures, claiming that approximately $200 million in partnerships at the rate of about $20 million per year were sold in the ten years prior to bankruptcy. They further claim that they could not form partnerships while undergoing reorganization, but that unvarnished explanation does not support the projected change of fortune after confirmation. And, at this point, well into 1986, there is still no evidence of committed investments to be made into firm projects. All that the Debtors could say is that they hope to do such business.

Each class has accepted the Plan by the numerical and amount majorities required by § 1126(c) of the Bankruptcy Code. As to classes 4 and 6, eleven unsecured creditors holding claims in the amount of $62,-452.60 and four debenture holders holding claims in the amount of $314,482 (32.5%) rejected the Plan.[3] Letters from two joint owners of debentures and stock, and six holders of royalty interests, which the Court deemed to be objections to the plan, were filed prior to the hearing. The letter from the debenture holders, which did not specify whether they held PEC or PGI debentures, stated that they did not believe that the plan was fair and equitable to holders of debentures or stock and objected to the purportedly excessive salary of $120,000 which is provided for Mr. Shippee. While such an assertion does not state a ground for denial of confirmation under § 1129 of the Code,[4] the letters evince a general dissatisfaction with the Plan.

Two letters of objection were received from six holders of royalty interests which complained generally of not being paid certain royalty payments. They claim they did not receive royalty payments for March, 1984, and assert that claims for such are secured claims. They object to confirmation on the ground that the Plan does not provide for them as Secured Creditors.

## II

The claims of holders of royalty interests to secured status is based on § 9.319 of the Texas Business and Commerce Code, Tex.Bus. & Com.Code Ann.

| | |
|---|---|
| Travel Expenses | $ 36,000 |
| Office Rental | $ 72,000 |
| Office Expenses (Supplies, Postage, Utilities, etc.) | $ 43,800 |
| Liability Insurance | $ 3,600 |
| Various Pre-petition State Taxes (amortized pursuant to § 1129(a)(9)(c) | $ 50,000 |
| Total Operating Expenses | $566,172 |

3. Counsel did not inform the Court if the dissenters were holders of PEC or PGI debentures. For purposes of this opinion, it is assumed that they include at least one holder of PGI debentures.

4. Under § 1129(a)(5)(B) of the Code, the proponent of the plan must reveal the nature of the compensation to be received by any insider who will be employed by the reorganized debtor. The Disclosure Statement so states. The Code does not require the Court to approve the amount of such renumeration.

§ 9.319 (Vernon 1986 supp.). That section generally provides a security interest in favor of interest holders to secure the obligation of the first purchaser of oil and gas production to pay the purchase price. The Debtors reply that § 9.319 does not apply to them because they were operators of their properties, as opposed to being a first purchaser. In any event, it is apparent that even were § 9.319 to apply, it is limited by § 9.306(d)(4) of the Texas Business and Commerce Code, Tex.Bus. & Com.Code Ann. § 9.306 (Vernon 1986 supp.), which generally limits the secured party's interest, when proceeds of the royalty are commingled with other funds of the debtor, to the maximum amount of the cash proceeds from royalty interests received by the debtor within the last ten days before it filed for reorganization. The royalty interest holders make no claim that such proceeds were received by PEC or PGI. It appears uncontested that no such proceeds were received. Consequently, the holders of royalty interests are, on this record, correctly treated as holders of general unsecured claims.

### III

Regardless of whether a valid objection to confirmation has been asserted, however, the Code imposes upon the Court the responsibility to determine whether the requirements of § 1129(a) of the Code have been met. *In re N.S. Garrott & Sons*, 48 B.R. 13, 15 (Bankr.E.D.Ark., 1984); *In re White*, 41 B.R. 227, 229 (Bankr.M.D.Tenn. 1984); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y. 1984); *In re Economy Cast Stone Company*, 16 B.R. 647, 650 (Bankr.E.D.Va.1981). Discharging this responsibility does not entail investigation of the debtor. But it does require the court to require sufficient documentation to be submitted and to ask appropriate questions concerning the requirements of § 1129(a). *E.g., In re Tavern Motor Inn, Inc.*, 56 B.R. 449, 454–55 (Bankr.D.Vt.1985). As that section states on its face, absent satisfaction of each of the requirements of § 1129(a), confirmation may not be ordered. In this the plan's

proponents, here the Debtors, have the burden of proof. *In re Trail's End Lodge, Inc.*, 54 B.R. 898, 903 (Bankr.D.Vt.1985).

### A.

Among those requirements is the mandate that the reorganized debtor have reasonable prospects for financial stability and success. A plan can be confirmed only if:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). The intent of this section is obvious: to confirm the plan of a debtor likely to return to bankruptcy is an abuse of the reorganization process; it would also diminish the willingness of those who deal with post-confirmation debtors to extend the credit that such companies often require.

Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11). Most debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985); 5 *Collier on Bankruptcy*, ¶ 1129.02 at 1129–34 (15th ed. 1985); *see also Chase Manhattan Mortgage and Realty Trust v. Bergman (Matter of Bergman)* 585 F.2d 1171, 1179 (2d Cir.1978) (construing the feasibility requirement under Chapter XII of the former Bankruptcy Act, 11 U.S.C. § 872 (1976) (repealed)). All that is required is that there be reasonable assurance of commercial viability. *In re Trail's End Lodge, Inc.*, 54 B.R. at 904.

In making that determination, the following factors are pertinent: the prospective earnings of the business or its earning power; the soundness and adequacy of the capital structure and working

capital for the business which the debtor will engage in post-confirmation; the prospective availability of credit; whether the debtor will have the ability to meet its requirements for capital expenditures; economic and market conditions; the ability of management, and the likelihood that the same management will continue; and any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan. *In re Toy & Sports Warehouse Inc.*, 37 B.R. at 151; *Matter of Landmark At Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N. J.1980); *see also In re Jartran, Inc.*, 44 B.R. 331, 393 (Bankr.N.D.Ill.1984); 5 *Collier on Bankruptcy*, § 1129.02, pp. 1129–34—1129–35 (15th ed. 1985).

■ In light of these factors, it can hardly be said, much less found, in these cases that "confirmation of the plan will not likely be followed by the liquidation or need for further financial reorganization...." 11 U.S.C. § 1129(a)(11). Most significantly, these are debtors whose track record under the protections of the Code bears no relation to the visionary earnings projected. Without the projected revenues of $324,000 in commissions and fees incident to the formation and management of new oil and gas partnerships, it is painfully obvious from the 1986 pro-forma income projection, which is reproduced in abbreviated form in the margin at note 2, *supra*, that there would be a loss of $224,000. Yet, no partnerships were formed in 1985, and only $2.1 million of partnership funds (generating commissions of $210,000) were raised in 1984. As opposed to evidence of success, this is evidence of prospective failure. *Compare In re Jartran*, 44 B.R. at 393 (debtor-in-possession maintained its revenue production in the face of adverse market conditions despite the pendency of its Chapter 11 case).

The absence of contracted for investments in 1986 with respect to identified and firm oil and gas projects intensifies this concern. Shippee testified that he has continuing contacts with prospective investors. But that unsubstantiated and optimistic testimony hardly rises to the level of orders in hand. The least one could hope for is that the 1986 projects would be significantly advanced with a significant number of investors having already committed to invest. Even then, the feasibility of these Debtors would be highly questionable given the reliance on finding new prospects and new projects at an increased level in 1987 and thereafter.

In answer to this concern, Shippee points to having formed an average of $20 million a year in partnerships during the ten years before bankruptcy. But, evidence of a decreasing trend from $20 million to $2 million to $0 hardly supports the notion that $3 million or even $2 million will be found in 1986. Were the trend otherwise, it might add feasibility. One can hardly rest the viability of a company on an overnight reversal of fortune.

These factors alone preclude a finding of feasibility. They are heightened, moreover, by the failure of the Debtors' projections and Disclosure Statement to consider the present and future nature of the industry in which it seeks to participate. It goes without saying that in this industry at this moment past experience is hardly a valid barometer of future performance. The recent precipitous drop in oil prices and the chilling effect they and the proposed federal tax legislation before Congress may have on the Debtors' fund raising activities and on the willingness of investors to buy partnership interests of the type in which the Debtors deal should have been considered. But it is clear from Shippee's testimony and demeanor that they were not and that his belated assertions of the absence of such an effect was merely a grasping at straws.

Recognizing these concerns, the Debtors submitted a December 16, 1985 article from the Wall Street Journal. That article, however, gives little if any comfort. There it is reported that sales of drilling partnership interests are down 82% from their 1981 peak, that the shake-out currently taking place in the oil industry is putting many weak firms out of business, that the fall in

oil prices has made drilling partnerships even riskier than usual for investors, and that with oil prices dropping, the financial strength of the sponsor becomes even more important in choosing a partnership because it impacts strongly on its ability to cover overhead during a period when oil prices are low. If anything, the article demonstrates that if there are persons still willing to make investments of this nature, they will do so with companies having considerably more strength than these debtors.

The Debtors' revenue projections also fail to take into account the effect of prospective tax revision legislation, which would probably be to hinder the Debtors' ability to meet its projections for raising capital by making less attractive the tax-advantaged investments which the debtor will be trying to sell. If enacted, the bill recently passed by the House of Representatives would reduce personal income tax rates for individuals and would curtail various tax and drilling incentives for corporations. *See generally,* Tax Reform Act of 1985, Report of the Committee on Ways and Means, House of Representatives, on H.R. 3838, H.R.Rep. No. 426, 99th Cong., 1st Sess. §§ 101, 251, 301 (1985).

Simply put, the debtors have not met their burden of proof under § 1129(a)(11). If anything, the evidence before us indicates that failure is likely.

### B.

The inability to confirm presented by these Debtors' failure to satisfy § 1129(a)(11) is compounded in this case by the concerns for whether the PGI Debentureholders are receiving under the Plan less than they would upon liquidation.

Section 1129(a)(7)(A) of the Code permits confirmation of a plan over the dissenting vote of the holder of an impaired unsecured claim if:

each holder ... of such class—

\*　\*　,　\*　　\*　　\*　　\*

(ii) will receive or retain under the plan on account of such claim or interest prop-

erty of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date....

That requirement has been and remains the chief protection that dissenting creditors have. "The Court must protect the interest of the minority which has not accepted, however small." L. King, et al., 9 *Collier on Bankruptcy* ¶ 9.17 at p. 284 (14th ed. 1978); *Technical Color & Chemical Works, Inc. v. Two Guys from Massapequa, Inc.,* 327 F.2d 737 (2nd Cir.1964); *Accord,* B. Weintraub and A. Resnick, *Bankruptcy Law Manual,* ¶ 8.23[2] at 8-104—8-105 (1986). Having given no evidence of the value of the new PGI stock being distributed to the PGI debentureholders under the plan, and it being apparent that any such value would be speculative, the Debtors and Committee assert that the PGI debentureholder debt would be subordinated on various grounds in the event of liquidation and that they would receive nothing. If subordination were in order it appears that there would be no return to the PGI debentureholders.

To justify subordination, it is argued that the claims of the PGI debentureholders should be subordinated as a result of the transaction out of which the PGI debentures arose, namely the 1983 exchange offer wherein PGI repurchased its common stock and issued debentures in exchange. The Debtors claim that *In re Micro-Acoustics Corporation,* 34 B.R. 279 (Bankr.S.D. N.Y.1983) supports their position that the debenture claims should be subordinated. That case, however, is inapposite. In *Micro-Acoustics,* the court subordinated to general unsecured creditors the claim of a stockholder which was based on the election of the debtor-corporation, one year before filing its Chapter 11 petition and pursuant to a state dissolution proceeding, to repurchase the claimant's stock in the debtor. Despite the debtor's election to repurchase the stock, the objectant was apparently still a shareholder as of the time the

petition was filed. Accordingly, the court ordered that the claim be subordinated, stating that it "... view[s] with suspicion the temptation on the part of stockholders to lay aside their garb as equity owners and to assume the role of creditors (citation omitted)." *Id.* at 282. That salutory policy is simply not applicable in a situation where the claimants were clearly creditors when the petition was filed and not shareholders.

Secondly, the Debtors, relying on *Gold v. Lippman (Matter of Flying Mailman Service, Inc.)*, 539 F.2d 866 (2d Cir.1976), attempt to justify subordination of the PGI debentureholders on the ground that their debentures were issued in exchange for PGI stock. This justification, however, is not supported by the record and raises more questions than it answers.

*Flying Mailman* concerned the deferred secured obligation of a New York corporate debtor to pay for the repurchase of stock to resolve a deadlock. Section 513(a) of the New York Business Corporation Law, ("N.Y.B.C.L."), N.Y.Bus.Corp.Law § 513(a) (McKinney 1963), enables a corporation to repurchase its own stock except "when currently the corporation is insolvent or would thereby be made insolvent," even when the debtor had sufficient surplus when it entered into the obligation. The Court interpreted the word "currently" to bar installment payments when the company subsequently became insolvent. Because subsequent creditors lacked notice of the arrangement, the Court affirmed the judgment of the district court holding the obligation "unenforceable in priority to the claims of subsequent creditors." 539 F.2d at 872.

Like N.Y.B.C.L. § 513(a), § 160(a)(1) of the Delaware Corporation Law, Del.Code. Ann. tit. 8, § 160(a)(1), (Michie 1983), which is applicable here, precludes a corporation from purchasing its own stock when the purchase "... would cause any impairment of the capital of the corporation." Unlike N.Y.B.C.L. § 513(a), however, § 160(a)(1) further provides:

> ... Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of a corporation given by it as consideration for its acquisition by purchase, redemption or exchange of its shares of stock if at the time such note, debenture or obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired.

Thus, the initial inquiry here is whether there is evidence of lack of surplus in 1983. No testimony of such was offered at the hearing. In a post hearing brief, the Debtors assert that an offering circular mailed in connection with the PGI exchange offer showed that PGI had a negative net worth in 1982 and remained insolvent thereafter, including when the debentures were issued. Because the circular was not admitted in evidence, indeed no copy was even submitted, we do not consider it. Moreover, there is no evidence of its being what it claims to be.

In addition, even were PGI then lacking surplus, there is no evidence to the effect that creditors lacked notice that the debentures were given in exchange for stock and that the PGI debentureholders should therefore be subordinated to them as *Flying Mailman* holds. One would think that MBank, having loaned so heavily to PEC and having obtained PGI's guaranty, may have had notice through monitoring these Debtors. The effect of notice on some or all of the MBank debt, particularly given its rollover nature, and on other debt has not been addressed by the Debtors. They do not claim that the Delaware courts would refuse to follow *Cross v. Beguelin*, 252 N.Y. 262, 265, 169 N.E. 378 (1929). There, the court held that, "The rights of creditors are, of course, superior to those of stockholders. The rights of the seller of the stock appear to be superior to those of subsequent creditors of the corporation who became such with notice of the purchase by the corporation of its own stock." 252 N.Y. at 265–66, 169 N.E. at 379 (citations omitted). The Second Circuit, in *Flying Mailman*, ruled that the notice exception remained viable. 539 F.2d at 870.

Perhaps the failure to submit cogent evidence concerning these points lies in the notion that PGI directors could be subject to liability if the transaction was as nefarious as is now averred. The Delaware courts have not hesitated to bar even solvent corporations from acquiring their own stock for an improper purpose such as to retain management control or to defeat a tender offer. *E.g., Petty v. Penntech Papers, Inc.,* 347 A.2d 140 (Del.Ch.1975). Directors who breach their fiduciary duties by engaging in such practices are to be ordered to account to the corporation. *Bennett v. Propp,* 187 A.2d 405 (Del.1962). It seems beyond cavil that directors who facilitate a purchase of the corporation stock when the company is insolvent are similarly to be charged. Such conduct is statutorily prohibited regardless of purpose.

Thus, the Debtors rely principally on contractual subordination to justify the disparate treatment given to PGI debentureholders. The terms of the indenture provide that the indebtedness is subordinate and junior to all "Senior Indebtedness" of PGI. That term is defined, in pertinent part, as "... all indebtedness, obligations and liabilities of the Company ... which is for ... money borrowed from banks ... or other financial or lending institutions, and similar borrowings ..." The context of the words seemingly indicates that the term "borrowed" refers to borrowings by the company, *i.e.,* PGI, as opposed to a guaranty by PGI of the repayment of loans made by banks to its subsidiary PEC. Had reference to the guaranty been intended, surely it would have been expressed since, we are told, it already existed. At best, the statement is ambiguous, requiring extrinsic evidence for its interpretation. None has been introduced in evidence. The Debtors' brief refers to the offering circular noted above. It cannot be considered since it is not before us. Having held that the plan cannot be confirmed for want of compliance with § 1129(a)(7) and it also appearing that the Disclosure Statement was inadequate as found below, there is no need to resolve this issue.[5]

### III.

In recognition of some of these concerns, MBank, by letter of counsel dated March 11, 1986, has requested, if the court determines the record is deficient, that it be reopened to entertain the expert testimony of one William Brennan. A copy of "Brennan Reports" for December 1985 is submitted with the letter, apparently as an indication of his testimony were the record reopened. The Debtors have submitted two *ex parte* post-hearing affidavits. Since that submission after the record has been closed is improper, we deem the affidavits to also be a motion to reopen the record.

Those motions must be denied. These papers were not served on other parties in interest. Moreover, they hardly establish the feasibility of these Debtors. On the contrary, they give further indication that the Debtors are likely candidates for further reorganization.

For example, the copy of Brennan Reports urges investor "caution" in light of the proposed tax legislation. In discussing a large sponsor of oil and gas drilling partnerships, moreover, Brennan notes that it and others in this field, apparently competitors of the Debtors, offer investors liquidity through marketable securities traded on a stock exchange. There are no indications that PGI stock or the partnerships it hopes to sponsor would be traded. In addition, it is observed that "It's been a difficult year for sponsors to raise capital from investors," thereby further diminishing PGI's hopes.

5. These considerations also lead to the concern that the plan is not in compliance with classification standards under § 1122 of the Code. Sections 1129(a)(1) and 1129(a)(7) make classification issues ripe at confirmation. Absent subordination, it appears that the claims of PGI debentureholders are incorrectly classified.

*E.g., Granada Wines, Inc. v. New England Teamsters & Trucking Industries Pension Fund,* 748 F.2d 42 (1st Cir.1984); *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106 (Bankr.S.D.N.Y.1983), *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y. 1984).

The Debtors' two affidavits raise even more pressing concerns. Basically, they urge that PGI should now be viewed as two different companies: one to manage existing partnerships and one to raise funds for new ones, with expenses distributed accordingly. It is further asserted that expenses attributed to facilitating new partnerships, including a portion of Shippee's salary, will not be incurred until investment commitments are made. On this basis, together with a revision of tax amortization to reflect a reduction in pre-petition taxes and a reduction of rent, it is claimed that the so-called partnership management side of PGI would earn a profit of $23,050 in 1986. Examination of the pro-forma income statements revised to fit this scenario, however, shows their fallacy.

First, none of these alleged revisions are at all binding. Nothing prevents management from revising PGI again to suit their whim if the hurdle of confirmation is crossed. Second, it is plainly apparent that some of the expenses attributed to facilitating new partnerships are fixed costs to be incurred regardless of investor committments, e.g., rent $12,000; utilities—$1,500, telephone—$8,000. Those fixed costs would nearly erase the asserted profit of $23,050. Third, some of the expenses utilized in calculating that profit are highly suspect. In the Disclosure Statement, legal fees of $24,000 for 1986 are stated. In the "revision", that sum is reduced, without explanation, to $6,000 and charged to the facilitating side. Audit fees of $50,000 are reduced to $20,000 on the ill-founded assumptions that audit work will be limited to preparation of a post-confirmation balance sheet and "acceptance by the S.E.C. of a form 10K limited to the plan of reorganization."

### IV.

This euphemistic "redoing of the numbers" hardly shows that confirmation will not likely be followed by liquidation or the need for further reorganization. Rather, it shows that no confidence can be placed in the Disclosure Statement in this respect for

management appears to have no basis on which to make estimates. Further, it demonstrates a cavalier treatment of both the requirements for confirmation and the statutory implication of § 1125 that disclosure statements be accurate. That there be adequate disclosure in plan solicitation is, however, at "the heart" of the reorganization process; it is designed to enable holders of claims and interests "to make an informed judgment about the plan." H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 409 (1977), U.S.Code Cong. & Admin.News 1978, p. 6365.

Furthermore, the materials and testimony produced at confirmation regarding the feasibility of the Debtors' hope to sponsor oil and gas partnerships and to attract investors are cause for grave concern. They reveal that the stature of the industry, the market effects of proposed tax legislation, the Debtors' lack of investment commitments and identified projects, the revenues produced in 1984 from that activity, the lack of such revenues in 1985 and the downward trend should all have been disclosed in the Disclosure Statement. Approval by creditors and confirmation by the Court of a plan

> is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business sufficient to meet the feasibility standard ..."

Sen. Report No. 95–989, 95th Cong., 2d Sess. 121 (1978), U.S.Code Cong. & Admin. News 1978, p. 5907.

It is for these reasons that § 1129(a) incorporates disclosure standards through § 1129(a)(2) in its requirement that the "... proponent of the plan complies with the applicable provisions of this title," and in the requirement of § 1129(a)(3) that the plan be "... proposed in good faith and not by any means forbidden by law." The facts enumerated above are all highly material to enabling, as § 1125(a)(1) requires, "... a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed

judgment about the plan ...'' They bear directly on the voting process and on the value of the stock that is to be distributed. Moreover, given the Debtors' claim of violation of § 160(a) of the Delaware Corporation Law, it appears that the estate has potential claims against some or all of the PGI directors with respect to the issuance of the PGI debentures, as discussed above. The existence of such claims is highly material to both their continuing stewardship and whether parties in interest should realize upon such claims. *See In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 260 (Bankr.S.D.N.Y.1985). In view of these shortcomings, it is now apparent the Disclosure Statement should not have been approved under § 1125 as containing adequate information. On this ground alone, confirmation may not be ordered.

Upon the foregoing findings of fact and conclusions of law, confirmation of the Debtors' Second Amended Joint Plan of Reorganization must be and hereby is denied. It is

SO ORDERED.