### In re AU NATURAL RESTAURANT, INC., Debtor.

**Bankruptcy No. 85 B 11343 (TLB).**

United States Bankruptcy Court, S.D. New York.

Aug. 1, 1986.

---

Macco, Hackeling & O'Shea, by C. Steven Hackeling, Melville, N.Y., for debtor.

Robert L. Rattet, New York City, for 38 Au Natural Restaurant, Inc.

Haas, Greenstein, Hauser, Sims, Cohen & Gerstein by Noel W. Hauser, New York City, for Murray Hill Mews Owners Corp.

## DECISION ON VARIOUS MOTIONS IN CONNECTION WITH DEBTOR'S LEASEHOLD INTEREST

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

Au Natural Restaurant, Inc., f/d/b/a Dorherb Restaurant, Inc. ("Au Natural" or "the debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code ("the Code"), 11 U.S.C. § 101 *et seq.* (West 1979 & 1986 Supps.), on August 21, 1985. Debtor is currently leasing its premises at 560 Third Avenue in Manhattan from Murray Hill Mews Owners Corp. ("Murray Hill" or "the landlord"), as successor in interest to Murray Hill Mews Associates, debtor's former landlord and the party named as lessor under the subject lease. Said lease was executed on October 1, 1976, to run for a term of fifteen years. Au Natural formerly operated a restaurant at the aforementioned location, but the premises were padlocked in April 1985 by the New York State Tax Commission; thus, debtor has not operated its business during the pendency of this case. All of the parties agree that, in order to reopen for business, a substantial capital outlay shall be required to finance renovations of the dilapidated premises. There is no committee of unsecured creditors in this case.

Presently, the following motions are pending before this court: (1) landlord's motion to vacate the automatic stay imposed by section 362 of the Code to permit it to prosecute eviction proceedings against the debtor, and to require the debtor to pay post-petition rent; (2) debtor's motion to assume and assign its lease and to enter into a management agreement in conjunction therewith; (3) debtor's motion to impose $500.00 costs on the landlord pursuant to 28 U.S.C. § 1927 (West 1986 Supp.) for vexatious litigation; and (4) a motion brought on by a certain contract vendee seeking an order authorizing the debtor to incur senior secured priority administration indebtedness pursuant to section 364 of the Code. Hearings were held before the undersigned on the foregoing motions on March 13 and April 10, 15 and 18, 1986, at which time decision was reserved.

### FACTS

At the outset it should be noted that throughout these proceedings debtor has couched its motion as one to assume and assign its lease pursuant to section 365. Likewise, the primary concern of the landlord, the only adverse party to file papers or attend the hearings, has been adequate assurance of future performance. Such was the focus of the parties while they

were before this court. In fact, early in the hearings, counsel to the debtor opined that the motion to assume and assign the lease was dispositive of all of the other motions. Tr. at 8.

Based on the representations of the parties and the papers before us, this court readily agreed with debtor's characterization of the proceedings. Tr. at 8. Following our careful perusal of all the documents submitted in connection with these motions, however, this court discerned that it is faced with much more than a simple landlord/tenant dispute over adequate assurance of future performance and non-payment of rent. Instead, we are being asked to approve a complex transaction, containing conflicting terms, which amounts to a conditional sale of all of the assets of the debtor, a management agreement with the prospective purchaser pending consummation of the sale, with an assignment of debtor's lease to take place at some future point in time.

Specifically, on February 27, 1986, Au Natural entered into an agreement with an entity known as 38 Au Natural Restaurant, Inc. ("38 Au Natural" or "the buyer") whereby debtor agreed to sell its restaurant and bar located at the subject premises to 38 Au Natural. The sale, if approved by this court, would include all of the chattels, merchandise, and equipment used in connection with the operation of the business, as well as the right to use the debtor's trade name, telephone number, and lease. Debtor's Exhibit 3, ¶ 1.

The purported purchase price is $500,000, however, the terms of payment are crucial to an understanding of the actual value of this amount. Thus, a check in the amount of $50,000 was tendered upon the signing of the agreement, said check being held in escrow by the debtor's attorney until the closing. An additional $100,000 is to be paid at the closing, however, this sum shall be paid not to the debtor, but to Sasson Jeans, Inc. ("Sasson") in lieu of its waiver of all administration claims against the debtor.[1]

The remaining $350,000 due under the terms of the agreement is to be paid in 20 equal quarterly installments[2] commencing one year from the date of confirmation. These installments are to evidenced by promissory notes which shall pay no interest.[3] The buyer shall provide the debtor with a purchase money security interest in the fixtures, chattels, and equipment located on the subject premises to secure this obligation. Debtor's Exhibit 3, ¶ 2. These fixtures, however, are valued by the parties at only $12,500. Id. ¶ 4. In addition, the lease is to be placed in escrow with debtor's attorney pending full payment of the notes. Id. ¶ 3. The lease, however, will expire by its own terms before the last of the payments under the promissory notes can be made.

The sale is conditioned upon the buyer's obtaining the requisite New York State Liquor Authority ("SLA") approval. Should the SLA deny buyer's request for a liquor license, the $50,000 payment is to be returned with neither party having any further claims against the other. Debtor may cancel the contract if the Alcohol and Beverage Control Board does not act on the buyer's application within 26 weeks. If, however, the license is not granted through no fault of the buyer, the agreement shall continue for 30 days *or until such SLA approval. Id.* ¶ 6 (emphasis supplied). A letter from the president of Sasson, Paul Guez, which is addressed to debtor's coun-

---

1. Sasson was listed in debtor's chapter 11 petition as a 50% shareholder of Au Natural. Paul Guez, the president of the debtor and signer of the corporate resolution which authorized Au Natural to file its petition, is the president of Sasson. Debtor's Exhibit 2; Tr. at 128.

2. Debtor's disclosure statement indicates that the $350,000 will be paid in 20 monthly $17,500 payments, whereas the plan specifies a quarter-

ly payout. *See* Debtor's Disclosure Statement § V.D. (filed 3/31/86); Debtor's Plan of Reorganization § IV. (filed 3/13/86).

3. We note that the present value of $350,000, which is not to be paid in full until a point in time some six years subsequent to confirmation and upon which no interest payments shall be made, is minimal.

sel, indicates that if 38 Au Natural is unable to procure a liquor license, "then Sasson Jeans, Inc. will purchase [debtor's] assets upon the same terms and conditions as [38 Au Natural]." Debtor's Exhibit 7. The agreement specifically provides that the assignment of the subject lease shall not be effected until the closing. Debtor's Exhibit 3, ¶ 32(e). Thus, just when the purported assumption and assignment of this lease is to occur, as well as who the eventual assignee shall be, is left in considerable doubt.

The February 27th agreement further provides that 38 Au Natural take possession of the debtor's premises on or before March 31, 1986 and that it be responsible for making all payments to the landlord. Debtor's Exhibit 3, ¶ 8. If the agreement is eventually consummated, the income and expenses accruing during the period of time from March 13, 1986 until the closing shall be chargeable to the buyer. *Id.* ¶ 21. During this period, the active principals, officers, and stockholders of the buyer shall each be entitled to $100 per week as salary under the management agreement. *Id.* ¶ 27. The closing of this transaction is scheduled for September 30, 1986 or within 72 hours of the requisite approval of this court and the SLA. *Id.* ¶ 15.

On March 13, 1986, debtor and 38 Au Natural entered into an amended agreement whereby the buyer affirmed that it would undertake good faith efforts to secure SLA approval and alcoholic beverage licensing. As part of this agreement, Boosung Park, the president of 38 Au Natural, guaranteed payment of all administration obligations incurred by the buyer in operating the business pending SLA approval. The agreement further provides that the debtor consents to 38 Au Natural's application to this court pursuant to section 364.

Buyer had made said application through an order to show cause dated March 6, 1986 wherein approval was sought for 38 Au Natural's lending of $50,000 to the debtor, as evidenced by a promissory note payable 180 days from execution bearing interest at the rate of 12% annually. Apparently, this amount, lent to the debtor for capital improvements, represents the $50,000 check tendered at the signing of the February 27th agreement. In lieu of lending this amount, 38 Au Natural seeks a superprority under section 364(c)(1) and a senior lien on all of debtor's property pursuant to section 364(d)(1). Should the deal be consummated, then upon confirmation [4] this superpriority and lien shall be waived. *See* Order to Show Cause of 38 Au Natural (3/6/86). If the buyer is unable to close because of its failure to obtain a liquor license, then Sasson will pay off the lien to 38 Au Natural. Tr. at 251.

The president of Sasson wrote a letter to Murray Hill whereby Sasson also undertook to guarantee the payment of all of the rent due under the subject lease. Debtor's Exhibit 6.

Au Natural's Plan of Reorganization, filed March 13, 1986 along with its Disclosure Statement, would implement the distribution of funds to creditors holding allowed claims following court approval of debtor's liquidation pursuant to the February 27th agreement. Under the plan, class I claims, i.e., administration expenses, would be paid in full in cash on confirmation. Class II claims which represent other section 507 priorities (including taxes) shall, on the effective date of the plan, be entitled to a pro rata distribution of one-sixth of the entire principal due, with the balance being paid in five equal installments with "appropriate" interest over a period of five years. *See* Debtor's Plan of Reorganization §§ II. & III. (filed 3/31/86).

The plan further provides for payment to class III general unsecured creditors of

---

4. Despite the explicit language of the order to show cause to the effect that waiver would take place upon confirmation, some confusion exists as to this term because of the following statement by 38 Au Natural's counsel: "Immediately upon confirmation his priority, whatever this lien is, and it's subject to *Flagstaff* [*General Electric Credit Corp. v. Levin & Weintraub* (In re *Flagstaff Foodservice Corp.*), 739 F.2d 73 (2d Cir.1984) ] exceptions, *will be waived at closing.*" Tr. at 251 (emphasis supplied).

"up to" 100% of the allowed amount of their claims, with payment being made in five equal installments over a period of five years, commencing on the one year anniversary of confirmation. Distribution to the general unsecured creditors, however, is limited to the excess available of each deferred payment made under the February 27th agreement after the annual one-sixth payment on class II claims. Class IV interest holders shall receive any amounts available after a 100% distribution on account of class III claims. *Id.*

Although debtor refers to its plan as one of reorganization, and it intends to issue new stock to the class IV interest holders, *id.* § III., the plan and disclosure statement fail to indicate any operations in which the reorganized debtor shall be engaged. Presumably, Au Natural intends to emerge from chapter 11 as a shell corporation whose only function will be to receive payments from the buyer and make yearly distributions to the creditors. This, however, is not specified in either the plan or disclosure statement.

## DISCUSSION

As indicated above, the record that debtor has made in this case is hardly a model of clarity, as Au Natural continually couched its motion as one to assume and assign its lease despite the fact that, because all of the parts of this agreement are so intertwined, other issues must be resolved before we can rule on the assumption and assignment motion.[5] Thus, Au Natural's February 20, 1986 order to show cause seeks an order "authorizing the debtor to assume its executory lease for [its premises] ... and assigning same to 38 Au Natural Restaurant, Inc. for the sum of $500,000.00 and to enter into a management agreement in conjunction therewith...." The fact that the relief being sought is predicated on sections 363 and 365 is not specified in the order to show cause as required by Rule 3(d) of the District Court Rules for this district,[6] although the pertinent sections are cited in the application underlying said order to show cause, with the February 27th agreement being attached as an exhibit thereto.

While this deficiency may, at first glance, appear to be merely a procedural technicality, it should be noted that notice and a hearing is a prerequisite to authorization of a sale of property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b)(1). Thus, where the moving papers fail to state that what is contemplated at the hearing is the approval of a liquidation of the debtor's estate outside of the plan of reorganization, we question whether the notice provided was "appropriate" under the Code. 11 U.S.C. § 102(1)(A) (indicating that the phrase "after notice and a hearing" is to be construed as being "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances").

Where the underlying notice is inadequate, the ensuing hearing can also be expected to be deficient. This was adequately borne out in the instant case, where the parties concentrated on the collateral issue of adequate assurance of future performance in relation to an assigment of the subject lease pursuant to section 365. Thus, Au Natural failed to address the concerns elucidated in the Second Circuit's decision in *Committee of Equity Security Holders v. Lionel Corp.* (In re *Lionel Corp.*), 722 F.2d 1063 (2d Cir.1983).

In *Lionel,* the debtor sought authorization pursuant to section 363(b) to sell its most important asset, its 82% interest in a profitable non-debtor corporation. As in the instant case, the debtor soon thereafter filed its plan of reorganization which was

---

5. In fact, as noted above, because of the manner in which the proposed deal is structured, the lease would not actually be assigned until some vague time in the future when 38 Au Natural procures SLA approval, or at such time as Sasson assumes 38 Au Natural's duties under the agreement.

6. Since the obtaining of this order to show cause, the Bankruptcy Court for the Southern District of New York has adopted its own set of Local Rules which continues this requirement. *See* Local Bankruptcy Rule 13(e).

conditioned upon the sale of the subject stock, with the incoming funds to be distributed to creditors. Testimony was elicited from one of debtor's principals to the effect that there was no reason why the sale could not be effected as part of the plan, and that the only reason debtor sought to accomplish the transaction in this manner was because of the insistence of the committee of unsecured creditors. *Id.* at 1065.

In weighing the balance to be struck between the ability to sell assets outside the ordinary course pursuant to section 363(b) and the safeguards afforded to creditors under chapter 11, the court concluded that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." *Id.* at 1070.

 Thus, it is incumbent upon the bankruptcy judge to expressly find from the evidence presented at the hearing that such a good business reason exists. *Id.* at 1071. In order to provide bankruptcy judges with guidance in this area, the *Lionel* court recommended a number of factors to be examined when deciding whether to grant a motion under section 363(b). Thus, the bankruptcy judge may consider:

the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*Id.* at 1071.

 In the instant case, no business justification was proffered by Au Natural other than the statement that it wanted to conclude the transaction in time for the summer season. Yet, debtor failed to support this assetion; in fact, the parties concede that the critical liquor license will not be obtained, if at all, until well beyond the summer. Furthermore, as noted by the court in *Lionel,* " '[t]he need for expedition ... is not a justification for abandoning proper standards.' " *Id.* at 1071 (quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 450, 88 S.Ct. 1157, 1176, 20 L.Ed.2d 1 (1968)).

Likewise, Au Natural has not explained why the transaction could not have been made a part of a liquidating chapter 11 plan, and has failed to convince this court that it should allow the debtor to circumvent the safeguards of chapter 11 because of some overriding business justification. *See Lionel, supra,* 722 F.2d at 1069–71. Debtor's failure to produce a sufficient evidentiary record upon which the relief sought can be granted, coupled with the unclear and inconsistent terms contained in the transaction, is sufficient grounds for this court to deny its motion. *See In re Santec Corp.,* 49 B.R. 59 (Bankr. D.N.H. 1985) (debtor failed to provide court with the precise terms and conditions of the sale agreement).

Furthermore, debtor's application is found to be lacking vis-a-vis *Lionel* 's proportionality factor, as Au Natural is attempting to sell all of the assets of the estate without having established a good business reason, 722 F.2d at 1071, whereas in *Lionel,* the debtor attempted to sell only a portion of its assets, albeit the stock which was the subject of the sale represented approximately one-third of Lionel's consolidated assets, *id.* at 1065. *See also In re Burke Mountain Recreation, Inc.,* 56 B.R. 72 (Bankr. D.Ver.1985) (value of the parcel intended to be sold under section 363(b) was only $20,000 as compared to a $3.5 million estate, and the sale was necessary to raise working capital to ensure the operation of the debtor pending its reopening for the winter ski season).

Another one of the factors set forth in *Lionel*, was the likelihood that a plan of reorganization would be proposed and confirmed in the near future. 722 F.2d at 1071. While Au Natural has proposed a plan, we have grave doubts as to its ability to proceed to confirmation.

In relation thereto, we are faced with the dilemma of whether the intital payment of $50,000 was part of the sale price, or was actually a loan as 38 Au Natural's motion under section 364 seems to indicate. The next payment of $100,000 will not be available to debtor's general unsecured creditors, or even its priority claimants, as this sum is earmarked for Sasson. We are thus left with the question of what funds shall be available to effectuate payments to creditors under the proposed plan.

The aforementioned $350,000 is payable quarterly in installments of $17,500, commencing one year from the date of confirmation. Thus, it appears that only $17,500 shall be available on the first anniversary of confirmation to satisfy the one-sixth distribution to priority creditors, as well as to meet the scheduled distribution to general unsecured creditors out of the "available excess funds." Debtor also has failed to demonstrate how it plans to make the initial one-sixth distribution to persons holding allowed priority claims, or even its ability to pay its administration expenses in cash on confirmation.

It should also be noted that distribution to creditors shall be effected over a period of five years from available funds, whereas the debtor shall be entitled to payment under the notes from 38 Au Natural (or Sasson if SLA approval is not obtained) for six years. The plan, however, does not indicate what shall become of the funds received during the sixth year. Pursuant to the terms of the plan, the creditors will not be entitled to such funds even if they will not have received 100% of their claims by such time.

While consideration of these issues may be premature, based on the foregoing this court questions debtor's ability to obtain the requisite acceptances of two-thirds in amount and over one-half in number of the allowed claims of each class. 11 U.S.C. § 1126(c). We also doubt whether this plan can pass muster under the feasibility standard of section 1129(a)(11). In a recent case, In re *Prudential Energy Co.*, 58 B.R. 857 (Bankr. S.D.N.Y.1986), the court rejected "unsubstantiated and optimistic testimony" in relation to projected revenues, as it utilized section 1129(a)(11) in refusing to confirm a plan which had been accepted by every class. *Id.* at 863. In accordance therewith, the *Prudential* court opined that "a plan based on impractical or visionary expectations cannot be confirmed." *Id.* at 862.

Accordingly, we hold that the February 27th agreement, as presented to this court, fails to meet the standard articulated by the Second Circuit in *Lionel*. As debtor's motion to assume and assign its lease cannot be segregated from the terms of the agreement before us, said motion is denied.

■ We now turn to 38 Au Natural's motion to obtain a superpriority pursuant to section 364(c)(1), as well as a senior lien pursuant to section 364(d)(1), as security for the $50,000 loan to Au Natural. To obtain either of the above, the Code requires a showing that the debtor is unable to obtain credit by some other, less drastic, means. 11 U.S.C. § 364(c) & (d). In addition, before a senior lien can be granted, the debtor must demonstrate that there is adequate protection for the secured party whose lien is being primed.[7] 11 U.S.C. § 364(d)(1)(B). As this burden has not been met, the motion is denied. Furthermore, we note that as this loan arrangement was offered as a part of the entire underlying transaction, and as this court is declining to place its imprimatur on said deal, it is superfluous to even consider this motion.

7. While no specific evidence was offered vis-a-vis any particular liens to be primed, the February 27th agreement indicates that there are such pre-existing liens on at least some of debtor's property, thus giving rise to the issue of adequate protection. *See* Debtor's Exhibit 3, ¶ 23.

Likewise, Au Natural's motion to impose costs upon Murray Hill pursuant to 28 U.S.C. § 1927 for vexatious litigation is denied due to debtor's failure to proffer any proof on this issue.

CONCLUSION

Based on the foregoing, Au Natural's motion to assume and assign its lease and enter into a management agreement in conjunction therewith, as well as its motion to impose costs upon Murray Hill, is denied. The motion brought on by 38 Au Natural for a superpriority and a senior lien is also denied. Murray Hill's motion to lift the automatic stay is restored to the calendar for further hearings on August 21, 1986 at 11:00 A.M.

IT IS SO ORDERED.