**In re AGAWAM CREATIVE MARKETING ASSOCIATES INCORPORATED d/b/a Agawam Associates and d/b/a Agawam Direct Marketing, Debtor.**

Bankruptcy No. 83–1695–JG.

United States Bankruptcy Court, D. Massachusetts.

Aug. 6, 1986.

Frederick Fisher, Jr., Hale & Dorr, Boston, Mass., for debtor.

Jacob Segal, Ronan & Segal, Salem, Mass., for Farmers and Traders Ins. Co.

Leonard A. Berkal, Berkal, Stelman & Davern, Salem, Mass., for Sec. Nat. Bank.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

The issue before the Court is whether the modified third amended plan of reorganization (the "plan") of Agawam Creative Marketing Associates, Inc. ("Agawam" or the "Debtor") should be confirmed. The Debtor's secured creditors, Farmers and Traders Life Insurance Company ("Farmers and Traders") and Security National Bank ("Security National"), as well as the Internal Revenue Service ("IRS"), have objected to the Debtor's plan. Confirmation hearings were conducted on March 12, March 21 and March 28, 1986, at which time the Debtor introduced exhibits and the testimony of several witnesses and the objecting parties had an opportunity to cross examine.

## FINDINGS OF FACT

Agawam, which conducts a full-service, direct-response marketing business, filed a Chapter 11 petition for relief on December 8, 1983. Pursuant to 11 U.S.C. § 1107 and 1108, it continued to operate its business as a debtor in possession. On January 16, 1984, the Debtor filed its schedules and statement of affairs. At that time, the Debtor listed debts totalling $3,391,265.40, including secured claims of $1,623,049.70 and unsecured claims without priority of $1,649,762.70. It also listed property totalling $1,436,176, including real property valued at $810,000, inventory valued at $25,110.52 and other liquidated debts (accounts receivable) valued at $109,875.54.

The Debtor's real property is described in schedule B–1 as a two story building of masonry and wood construction, containing 19,844 square feet of space used for office, manufacturing and warehouse purposes. The property was conveyed by the Debtor to the Agawam Realty Trust by deed dated December 29, 1978. Accordingly, the Debtor indicated that its present interest in the property is as the sole beneficiary of the Agawam Realty Trust. The Debtor's valuation of the property in its schedules was predicated upon a March, 1981 appraisal using the income approach. Subsequent pleadings and disclosures by the Debtor reveal that $354,450 or $450,000 are more appropriate estimates of the property's value.

In March of 1984 and again in August of 1985, the Debtor amended its list of unsecured claims without priority. The net effect of these amendments and the Debtor's reappraisal of the value of its real property obviously serve to increase the number and

amount of the Debtor's liabilities and to decrease the value of its assets. Indeed, the Debtor's third amended disclosure statement, which was filed in August of 1985, reveals that $428,650.84 would be available to creditors upon liquidation.

The Debtor's two largest secured creditors have maintained an active interest in this proceeding. In March of 1984, Farmers and Traders filed a motion for relief from stay. Several months later, on October 17, 1984, Security National also filed a motion for relief from stay. Neither motion was granted. However, both parties continued to monitor the Debtor's activities.

In response to a motion by the United States Trustee to fix a date for filing a plan and disclosure statement and a consent order entered pursuant thereto, the Debtor filed a plan of reorganization on January 31, 1985 and a disclosure statement on February 6, 1985. In May of 1985, the Debtor filed an amended plan and an amended disclosure statement. Three and one half months later, the Debtor filed a second amended plan and a second amended disclosure statement. Shortly thereafter, following an August 14, 1985 hearing on the Debtor's second amended disclosure statement and objections thereto, the Debtor filed a third amended plan and a third amended disclosure statement. The Court approved the third amended disclosure statement ("the disclosure statement") on September 24, 1985, the objecting parties having failed to appear, and scheduled a confirmation hearing for November 18, 1985. On October 16, the Court entered an amended order approving the Debtor's disclosure statement and rescheduled the confirmation hearing for December 3, 1985. However, at Agawam's request the confirmation hearing was postponed until March 12, 1986, and then continued until March 21, 1986. Prior to the latter date, on March 20, 1986, the Debtor filed a fifth plan with the Court—the modified third amended plan of reorganization.

Apparently, between August of 1985, when the third amended disclosure statement and third amended plan were filed, and March of 1986, the Debtor found it necessary to make a number of adjustments to the plan of arrangement contemplated by the third amended disclosure statement. The Debtor's third amended disclosure statement and third amended plan divide the creditors and stockholders of the Debtor into eight classes. In contrast, the modified third amended plan divides the creditors and stockholders of the Debtor into nine classes, by adding, as Class One, a class of claims held by professional persons who have rendered services to the Debtor in its Chapter 11 case, i.e., Barron & Stadfeld, counsel to the creditors' committee, and Hale and Dorr, counsel to the Debtor. The plan provides for the payment of their claims in installments.

Original Class One (Class Two under the plan) is comprised of the secured claim of Farmers and Traders. Farmers and Traders lent Agawam $290,000 in June of 1975. The loan was secured by a first mortgage on the Debtor's real property and was for a term of fifteen years. The contract rate of interest was 9.75%.

The Debtor's third amended disclosure statement states that Farmers and Traders is to receive $267,358.60 in equal yearly installments over thirty years, all unpaid amounts to bear interest at a rate of 9.75% per annum, the first payment to be made thirty days after the effective date of the plan. The disclosure statement also indicates that Farmers and Traders is to retain its security interest in and mortgage on the Debtor's real property.

In the Debtor's modified third amended plan, the amount to be paid Farmers and Traders is stated to be $328,318.73, an increase of $60,960.13 from the amount contemplated in the third amended plan. However, the Debtor made no other changes to the treatment of Farmers and Traders' claim.

In the Debtor's third amended disclosure statement, Class Two (Class Three under the plan) is comprised of the secured claim of Security National. Security National has two loans outstanding: 1) a revolving

loan secured by a first priority lien in the Debtor's accounts receivable, inventory, furniture, fixtures and equipment; and 2) a mortgage loan secured by a second mortgage on the Debtor's real property. Notably, the value of Security National's interests in the real property and personalty is less than the amounts it is owed.

The disclosure statement reveals that the revolving loan was made on December 9, 1981 and was in the original amount of $351,833.67. The Debtor also discloses that the loan was originally for a term of five years and eleven months and bears interest at the rate of 3% over prime. As of the filing date, a principal balance of $291,657.67 was outstanding. The Debtor, in the third amended disclosure statement, indicates Security National is to receive $74,200.84 in equal yearly installments of principal and interest over twenty years, all unpaid amounts to bear interest at the contract rate in satisfaction of this claim.

With respect to the second mortgage loan, Agawam discloses that it was in the original principal amount of $995,000 and is guaranteed up to 90% by the Farmers Home Administration. The loan was made on December 11, 1979 and is comprised of five separate notes.[1] The notes bear interest at the rate of 1.5% below prime, but in no event is the interest rate to be lower than 9.5% nor higher than 13%.

The third amended disclosure indicates that Security National is to retain its security interest in and mortgage on the Debtor's real property and is to receive $87,-091.40 in equal yearly installments of principal and interest over twenty years, all unpaid amounts to bear interest at the contract rate, with the remainder of the amounts due under the mortgage loan being treated as unsecured.

The modified third amended plan revises the treatment afforded the mortgage claim of Security National to the extent that:

> For purposes of 11 U.S.C. § 506, the parties have agreed that the value of the Real Property is $450,000.... As provided by the terms of the original notes to Security, Security shall receive in full satisfaction of its Mortgage Claim, $108,-257 in four (4) installments. The first installment of $31,994 shall be made in December of 1986; the second installment of $19,263 shall be made in December of 1989; the third installment of $18,-962 shall be made in December of 1994 and the final installment of $38,039 shall be made in December of 2009.

The Debtor discloses that it made no payments to either Farmers and Traders or Security National during the Chapter 11 proceeding. The Debtor also reveals that it did not make payments to reduce the claim of Joseph Trowbridge whose secured claim comprises Class Three (Class Four under the plan). Indeed, the Debtor had made no payments to reduce Trowbridge's claim, which ostensibly is secured by a third mortgage on the Debtor's real estate, since December 31, 1979 when the loan was rewritten for $20,000 with interest accruing at the rate of 9%. The third amended disclosure statement indicates that the principal balance of $20,000 and the accrued but unpaid interest of $7,200 is unsecured and is to be so treated because the first and second mortgagees' claims in the aggregate are greater than the value of the real property. The plan does not alter

---

1. The third amended disclosure statement provides:

> The first note was in the original principal amount of $304,800 and is for a term of seven (7) years. As of the Filing Date, the principal amount owing on the first note was $284,-642.29. The second note was in the original principal amount of $174,500 and is for a term of fifteen (15) years. As of the Filing Date the principal amount owing on the second note was $171,376.08. The third note was in the original principal amount of $175,-000 and is for a term of ten (10) years. As of the Filing Date, the principal amount owing on the third note was $168,703.54. The fourth note was in the original principal amount of $109,500 and is for a term of thirty (30) years. As of the date of the Chapter 11 filing, the principal amount owing on the fourth note was $107,221.99. The fifth note was in the original principal amount of $231,-200 and is for a term of thirty (30) years. As of the date of the Chapter 11 filing, the principal amount on the fifth note was $231,200.

the treatment of this claim as an unsecured claim.

The third amended disclosure statement indicates that Class Four (Class Five under the plan) is comprised of the secured claims of Essex Bank, HBE Leasing Co., ("HBE") and IBM Corp. ("IBM"). No payments were made to any of these entities during the Chapter 11 proceeding. The modified third amended plan does not alter the treatment of the claims of HBE and IBM (payment of 10% of HBE's claim—$518 in five annual installments without interest plus retention of its lien, and payment of 10% of IBM's claim—$112 in five annual installments without interest plus retention of its lien) but provides for no distribution to Essex Bank in view of the abandonment of the two automobiles that were the subject of Essex Bank's claims.

Class Five (Class Six under the plan), according to the third amended disclosure statement, is comprised of the priority claims of the IRS, the Commonwealth of Massachusetts and the Town of Rowley. The third amended disclosure statement provides that the Commonwealth of Massachusetts is to receive interest on its claims at the rate set forth in section 6621 of the Internal Revenue Code, as adjusted from time to time, plus 2½%, whereas the IRS is to receive interest at the rate required by the bankruptcy court or at rate upon which the parties may agree. Neither the third amended disclosure statement nor the modified third amended plan provide interest on the Town of Rowley's claim.

Class Six (Class Seven under the plan) is comprised of the claims of unsecured creditors, excluding the claim of the Wickford Realty Trust ("Wickford"). According to the disclosure statement, Class Six claims are estimated to be $2,500,000, excluding Wickford's claim in the amount of $177,-474.20, a significant increase over the scheduled amount of unsecured claims, i.e., $1,649,762.70.[2] Holders of Class Six claims are to receive a cash dividend of 5% payable in four equal installments.

Class Seven (Class Eight under the plan) consists of the claim of Wickford. Under both the third amended plan and the modified third amended plan, Wickford's equity interest in the Debtor is to be extinguished. A new series of common stock is to be issued to it in exchange for the release of its claim.

Class Eight (Class Nine under the plan) is comprised of all equity security holders of the Debtor. The disclosure statement, consistent with the modified third amended plan, provides that the interests of these claimants are to be extinguished.

The Debtor maintains that the modified third amended plan does not adversely change the treatment of claims or interests of any class which has not accepted the plan. Class One, Class Four, Class Five, and Class Eight, as defined in the plan rather than the disclosure statement, voted to accept the plan. Class Two, Class Three and Class Seven voted to reject the plan. The Town of Rowley, the only member of Class Six voting, voted to reject the plan. Class Nine is deemed to have rejected the plan.

At the time of the confirmation hearing on March 21, 1986, numerous objections to the Debtor's various plans had been filed. The United States of America on behalf of the IRS filed objections to the Debtor's plans on April 25, 1985, July 1, 1985 and September 5, 1985; Campaign Communications Institute of America, Inc. filed an objection to its classification in the Debtor's initial plan and, on September 4, 1985, filed an objection to the Debtor's third amended plan; HBE filed an objection to the Debtor's initial plan on April 29, 1985; and Farmers and Traders filed an objection to the third amended plan on September 5, 1985. Although Security National did not file a pleading objecting to the plan per se, on March 27, 1985, it filed an objection to the Debtor's first disclosure statement

---

2. The amendments to the Debtor's schedules do not account for the discrepancy between the two figures.

which contains specific objections to the plan rather than the disclosure statement. In view of the fact that only the IRS, Farmers and Traders and Security National chose to appear at the confirmation hearings and that HBE (and IBM) subsequently voted to accept the modified third amended plan, only the objections of the IRS and the secured parties will be considered.

The IRS has objected to the plan on the grounds that it fails to provide for an appropriate rate of interest on the deferred claims of the IRS; that, unlike the state taxing authorities, it will be paid yearly rather than quarterly; and that the plan does not specify how unassessed but outstanding federal tax claims will be paid.

Farmers and Traders objects to the plan on essentially two grounds. It asserts the plan is not feasible in that there is no "reasonable prospect" that the debtor can obtain the gross income necessary to make the required payments to creditors and that the plan does not comply with the provision of Chapter 11. Specifically, Farmers and Traders states that: 1) it will receive or retain property of a value, as of the effective date of the plan, that is less than the amount it would receive if the Debtor was liquidated under Chapter 7; 2) the plan does not provide for payment of the damages it has incurred as a result of its reasonable reliance on the contractual provisions of the mortgage and applicable law providing for the acceleration of payment of the underlying debt; 3) the plan extends the length of the mortgage twenty-four years without changing the original rate of interest; 4) the plan alters the legal, equitable and contractual rights to which it is entitled; and 5) the plan fails to consider the present value concept and adequately protect it for the delay and risk in payment. Security National's objection to the Debtor's plan is similar to that of Farmers and Traders. Security National asserts the plan fails to provide it with payments required under the loan documents and does not consider the present value concept.

At the confirmation hearing on March 21, 1986, the objection of Farmers and Traders was addressed to the extent that counsel for the Debtor indicated that the modified third amended plan would be further amended to provide Farmers and Traders with a higher interest rate than the contract rate provided for in the plan, i.e., 12% instead of 9.75%. Counsel for the Debtor also introduced as an exhibit a graph, based upon documents filed with the United States Trustee, purporting to show a "running summary" of Agawam's bi-weekly profits and losses between December 8, 1984 and February 15, 1985. As of the latter date, the Debtor showed a cumulative net profit of $5,060.15. The graph was admitted into evidence as Exhibit 1.

At the beginning of the continued confirmation hearing on March 28, 1986, counsel for the Debtor began his presentation by stating that the graph introduced at the prior hearing as Exhibit 1 was misleading. According to Debtor's counsel, the chart was but a statement as to the amount of money in the bank and failed to show receivables and the build-up in inventory.

In the course of the final hearing, Frank C. Romano ("Romano"), the Debtor's president, and John A. Donovan ("Donovan"), Vice-President for Financial Planning for Elder Care Services, Inc. ("ECS"), an affiliate of the Debtor, testified. Romano stated that during the approximately two years the Debtor has been in Chapter 11 the Debtor has achieved a cumulative positive cash flow of over $80,000, despite the Debtor's losses in 1984. According to Romano, this result was achieved by the elimination of non-profitable accounts and a change in product mix to take advantage of more profitable products and services. In conjunction with his testimony, Romano referred to a booklet entitled "Feasibility Analysis", dated March 27, 1986. This booklet was subsequently admitted into evidence as Exhibit 2. (Attachments A, B, C, and D to Exhibit 2 are attached hereto as Appendix 1.)

Romano further testified that if the Debtor's plan is confirmed, ECS will enter into a lease for a portion of the building from which the Debtor conducts its busi-

ness operations. A copy of the proposed lease, which provides for a fixed minimum rent at an annual rate of $69,682, is included in Exhibit 2.

Exhibit 2, Attachment A contains cash flow projections for the years 1986–1991, although the yearly payment of $36,756 contemplated under the plan for Farmers and Traders extends through the year 2016, and the last payment to be made to Security National under the mortgage loan is to be made in 2009. The projections are based upon actual twelve month operating statements for the years 1984 and 1985, years in which the Debtor was making no payments to its secured creditors. In 1984, according to the operating statement, the Debtor lost approximately $64,200, whereas, in 1985, the Debtor achieved a net profit of $16,400.

On cross examination, counsel for Farmers and Traders focused upon *inter alia* the discrepancy between projections of yearly rental income of $98,800 contained in exhibits attached to the Debtor's earlier disclosure statements and the projections contained in Exhibit 2. Counsel also noted the discrepancy between the lease which provides for the rental of office space only and Romano's testimony that both office and warehouse space would be rented to ECS.

Additionally, counsel for Farmers and Traders pressed Romano on issues raised by Attachment A and the Debtor's "restructured debt analysis for the plan of arrangement", Attachment B to Exhibit 2. Romano was unable to explain satisfactorily the breakdown of the depreciation expense item, which when added to the Debtor's net income provides approximately 50% of the Debtor's cash generated from operations. This, in turn, provides the Debtor with cash available to service debt. For example, the debtor, assuming a 5% growth in revenues and expenses, projected a net income for 1986 of $54,916. To that amount, the Debtor has added $54,761 for depreciation, yielding $109,677. When this amount is added to the $4,820 in cash available from 1985 and then cash disburse-ments to meet plan payments are accounted for, the Debtor's ending cash position is a meager $672 in 1986.

Counsel for Security National, in his cross examination of Romano noted, with reference to Exhibit 2, Attachment D, that ECS, the Debtor's future tenant, is also its largest account receivable. Indeed of the $78,346 in receivables owing as of December 31, 1985, ECS is responsible for 48.5% of them. Donovan testified that the dollar amount and customer base for receivables shown in Exhibit 2, Attachment D was indicative of what the Debtor could expect in the near future.

Like Romano, Donovan testified as to changes in the operations of the Debtor's business during the Chapter 11 which resulted in increased profitability. Donovan also testified about ECS and its intentions with respect to renting space from the Debtor. Although Donovan asserted that ECS' accounting department would always remain at ECS' headquarters in Rowley, and, therefore, would need to rent some space from the Debtor, Donovan revealed that ECS was developing property in Hingham, Massachusetts for its corporate offices and intended to move its offices there within eighteen months to two years.

## CONCLUSIONS OF LAW

Regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court the responsibility of determining whether the requirements of 11 U.S.C. § 1129(a), and if applicable 11 U.S.C. § 1129(b), have been met. *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). Section 1129(a)(8) conditions confirmation upon a showing that all classes impaired under the plan have voted for acceptance. If this requirement is not met, section 1129(a)(8) may be circumvented if the debtor can demonstrate that the criteria outlined in 11 U.S.C. § 1129(b)(1), the so-called "cramdown" provision, have been met. *In re Stoffel*, 41 B.R. 390, 392 (Bankr.D.Minn. 1984). The plan proponents have the burden of proving satisfaction of each of the

requirements of section 1129(a), *In re Prudential Energy Co.*, 58 B.R. at 862, and the burden of proving that the plan meets the fair and equitable standards of section 1129(b)(1) by clear and convincing evidence. *In re Stoffel*, 41 B.R. at 392; *In re National Awards Manufacturing, Inc.*, 35 B.R. 691, 693 (Bankr.S.D.Ohio 1983).

There is no dispute that the requirements of section 1129(a)(1), (2), (4), (5), (6), (9) and (10) have been met. With respect to section 1129(a)(9), in its post-confirmation hearing brief, the debtor argues that the provisions of that section are satisfied. It states that, all administrative claimants (section 507(a)(1) creditors) have agreed to the proposed treatment of their claims, and that, as provided by subsection (a)(9), all holders of priority tax claims (section 507(a)(7) creditors) will receive cash payments over a period not exceeding six years after the date of assessment of such claims with interest at the Internal Revenue Code rate (26 U.S.C. § 6621) plus 2½% to enable these claimants to receive deferred cash payments equal to the allowed amount of their claims. Although the Court notes that the United States on behalf of the IRS objected to the plan, and the Town of Rowley voted to reject the plan, neither party has pressed their opposition to their treatment under the plan, as modified by Debtor's counsel's oral representations with respect to the interest rates payable to the IRS and the Town of Rowley. Therefore, the Court finds that the requirements of section 1129(a)(9) have been met.

However, there is a dispute as to whether the requirements of section 1129(a)(3), (7) and (11) have been met. Furthermore, since it is clear that section 1129(a)(8) has not been satisfied, because *at least* classes Two, Three and Seven are impaired (cf. 11 U.S.C. § 1124) and have not voted to accept the plan, the requirements of section 1129(b)(1) must be satisfied.

At the confirmation hearing and in its bench order of March 28, 1986, the Court focused on the issue of the plan's feasibility. Pursuant to section 1129(a)(11), a plan can be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The purpose of section 1129(a)(11) is manifold: 1) " 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan that the debtor can possibly attain after confirmation,' " *In re Pikes Peak Water Company*, 779 F.2d 1456, 1460 (10th Cir.1985), *quoting In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985) and L. King, 5 *Collier on Bankruptcy* ¶ 1129.02 [11] (15th ed. 1984); 2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to return to bankruptcy, *In re Prudential Energy Co.*, 58 B.R. at 862; and 3) to promote the willingness of those who deal with post-confirmation debtors to extend the credit that such companies frequently need. *Id.*

The Court of Appeals for the Eighth Circuit recently ennunciated the Court's obligation in construing feasibility requirements: " '[i]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.' " *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985), *quoting United Properties, Inc. v. Emporium Department Store, Inc.*, 379 F.2d 55, 64 (8th Cir.1967). "Success need not be guaranteed." *In re Monnier Brothers*, 755 F.2d at 1341. However, when long term payments are contemplated stricter proof of feasibility is required. *In re White*, 36 B.R. 199, 204 (Bankr. D. Kan.1983); *In re RKO Associates*, 4 Bankr. Ct. Dec. 462 (Bankr.S.D.N.Y. 1978).

The Court in scrutinizing the plan should consider "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management." *In re Mer-*

*rimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass.1983). Other factors include the prospective availability of credit and whether the debtor will have the ability to meet its requirements for capital expenditures. *In re Prudential Energy Co.*, 58 B.R. at 862–63. In light of these factors, this Court cannot find that confirmation of the Debtor's plan "will not likely be followed by the liquidation or the need for further financial reorganization...." 11 U.S.C. § 1129(a)(11).

█ As this Court said in *In re Merrimack Valley Oil Co.*,

[w]here a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of the Chapter 11 is probative of feasibility. Income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic predictions.

32 B.R. at 488 (citations omitted). In the instant case, Agawam proposes to fund its plan out of operating revenue. Therefore, its financial record during the Chapter 11 is probative of feasibility. The Court is unpersuaded that the Debtor's cash flow projections are reliable. The Court finds that the financial progress made by the Debtor between 1984 and 1985 cannot support the Debtor's projections, in view of the thirty year payout contemplated for Farmers and Traders and the discrepancy between Exhibit 1, which shows a net profit of approximately $5000 for a fifty-eight week period, including 1985, and Exhibit 2, which shows the Debtor to have achieved a net profit of over $16,000 in 1985. Although Debtor's counsel may be correct in suggesting that Exhibit 1 is misleading and the Court notes that bi-weekly reports to the United States Trustee are cash receipts and disbursements reports that do not show receivables, inventory build-up and the increase, if any, of post-petition debt, the Court hesitates to draw the conclusion that the data sub-mitted to the United States Trustee upon which Exhibit 1 is based is inaccurate. As a consequence, the Court is unable to reconcile the apparent conflict between the two exhibits both of which purport to show the debtor's net profitability.

Compounding this problem with the Debtor's cash flow projections, Attachment A to Exhibit 2 shows that in 1985 the Debtor had a net cash surplus to fund the plan of $71,123, a figure which the Court considers to be seriously misleading. The Debtor does not include a Statement of Changes in Financial Position in Exhibit 2. Nevertheless, if the balance sheets in Attachment C are compared, and the fixed assets are adjusted to reflect $8,277 in new equipment or capitalized expenses,[3] it is clear that the Debtor's cash flow for 1985 can be accounted for as follows:

| | |
|---|---:|
| cash | 1,243 |
| accounts receivable | 48,286 |
| inventory | 5,116 |
| pre-paid expenses | 2,973 |
| fixed assets | 8,277 |
| accounts payable (decrease) | 6,380 |
| | 72,275 |
| Less: | |
| loan financing fees | 1,018 |
| accrued expenses | 10 |
| treasury stock | 125 |
| adjustment for error | 1 |
| | $71,123 |

Thus, the Debtor did not have $71,123 in cash on hand at the end of 1985; rather, it had cash in the amount of $1,243. Therefore, the Debtor's projection in Attachment A showing the availability of $109,677 in cash to fund the plan in 1986 and ever increasing amounts in subsequent years is simply wrong. Furthermore, the Debtor's failure to provide meaningful amounts for equipment replacement in view of the $8,277 increase in 1985 is wrong, as well.

Additionally, an undocumented depreciation expense item is used to obtain cash flow to service debt. The evidence presented at the confirmation hearing revealed that the accuracy of the Debtor's depreciation expense projection is largely determi-

---

**3.** The difference between the value of the 1984 fixed assets of $255,833 and the 1985 depreciation expense of $54,761 is $201,072. $8,277 is the difference between the value of the 1985 fixed assets of $209,349 and $201,072.

native of the feasibility of the plan, assuming the validity of the Debtor's projected net income in the first instance. Only when this expense item is added to the Debtor's projected net income is the Debtor in a position to make the substantial payments contemplated by the modified third amended plan, as modified by Debtor's counsel's representations during the confirmation hearings. In view of the problems just discussed, the Court is reluctant to substitute "[t]he amount of working capital or cash provided from operations ... for an improvement upon properly determined net income as a measure of results of operations and the consequent effect on financial position." E. Faris, *Accounting for Lawyers* 379 (4th ed. 1982), *quoting* Opinions of The Accounting Principles Board No. 19, "Reporting Changes in Financial Position" ¶ 15 (New York: American Institute of Certified Public Accountants, 1971).

With respect to the Debtor's capital structure, the comparative balance sheets shown on Attachment C to Exhibit 2 were not discussed by the Debtor's witnesses. In the owner's equity section of the balance sheet, the phrase "due to old entity" appears followed by the figure $447,773 for both years. These unexplained numbers produce a positive total equity for the years in question. However, the liabilities section of the balance sheet does not appear to reflect the substantial debt owed to secured creditors. If this debt were included, both statements clearly would show an insolvent company.

In its third amended disclosure statement, the Debtor lists unanticipated high interest rates and unfavorable economic conditions for a protracted period as two of four primary causes of its financial difficulties. Additionally, the Debtor states that due to its change in direction in 1976 from operating as a mailing house to operating as a full-service, direct-response marketing agency it was essentially a start-up operation in that year. The Debtor states that it reached the break-even point in 1979, within the time frame generally projected for start-up operations, when it and its clients were especially hard hit by the 1980 recession. The Debtor, then, in its present mode of operation, has never had a track record demonstrating profitable operations over a five year, much less a thirty year, span of time. Furthermore, the Debtor's own financial history demonstrates the fallacy of being complacent about economic conditions. Yet, in its post confirmation hearing brief, the Debtor argues "[t]here is no reason to believe economic conditions will in any way negatively affect the Debtor's business operations." The Court does not share the Debtor's sanguine view. Even assuming the validity of the Debtor's net profit projections in Exhibit 2, Attachment A and the depreciation expense item added to the net income projections as a source of funds, the ending cash positions for 1986: $672; 1987: $23,628; 1988: $28,687; 1989: $15,819; and 1990: $23,534 do not provide a sufficient cushion in the event that any of the Debtor's assumptions are wrong or there is a downward trend in the economy which would adversely affect the Debtor.

For example, Farmers and Traders in its post-confirmation hearing brief asserts that the amount it is owed is actually $339,634.19 (as of May 15, 1986) instead of the $328,319 figure used by the Debtor because of the accrual of interest at the per diem rate of $69.42 from December 3, 1985. Assuming Farmers and Traders is correct and the Debtor's annual payment to it must be increased, the plan undoubtedly will fail the first year since the increase exceeds $672. Clearly, it is inappropriate for the Court to confirm a plan that "is so narrowly constructed that any swing in the assumptions to the negative causes the plan to fail." *In re Cott*, 49 B.R. 570, 572 (Bankr.W.D.Mo.1985).

Furthermore, the testimony presented at the confirmation hearings highlighted the dependence of the Debtor on its affiliate ECS. Indeed, Donovan admitted that the difference between the Debtor's operating expenses and debt services could be made up only through the additional rental income provided by ECS. The Court is troubled by the contradictory testimony with respect to the Debtor's lease with ECS,

given the admitted importance of that arrangement to the Debtor's ability to make its long term plan payments, and the remote possibility that the Debtor could obtain credit, since it is even unable to persuade its affiliate to enter into a lease arrangement without Court approval of its plan.

Donovan testified that ECS had a net worth of three million dollars in 1983 according to its audited financials. However, the audited financials were not introduced into evidence, no detailed information was presented either in the Debtor's disclosure statement or at the confirmation hearings about ECS, and over half the amount of its bills payable to Agawam is shown to be over 31 days old in Exhibit 2, Attachment D. Since ECS is likely to continue to be the Debtor's largest customer, some type of prognostication about its future and its marketing budget is warranted. Absent such a showing, the Court is skeptical that ECS can make rental payment of $69,682 annually. Additionally, given the information about the age of the Debtor's accounts receivables, the Court is concerned that the Debtor has no reserve for bad debts; and, given the age of the Debtor's accounts payable the Court is concerned about whether the plan provides for the payment of past due, post-petition payables.

Finally, the Court is compelled to observe that the Feasibility Analysis constructed by the Debtor appears to be simply another in a long series of plan amendments. Indeed, no plan is before the Court that provides Farmers and Traders with 12% interest per annum on the unpaid balance of the Debtor's obligation or that provides the IRS and the Town of Rowley with interest at the IRS rate plus 2½%. Only the Feasibility Analysis sets forth these details, and they properly should be included in a plan. In short, the Debtor's history of repeated plan amendments and the absence of a third party able or willing to infuse the Debtor with new capital provide a clear indication that confirmation would likely be followed by the need for further financial reorganization. Given the magnitude of the Debtor's outstanding obligations, and the sharp-

ly reduced projections of the Debtor's total revenues between earlier cash flow projections and the most recent one, ostensibly due to the elimination of unprofitable accounts, the Court is led to suspect a "numbers game" is being played to advance confirmation of a financial fantasy. Nevertheless, the Court will reserve for another day the legal question of whether there can be a reorganization if the Debtor remains insolvent.

In view of the Court's decision with respect to the feasibility issue, consideration of the issues raised by Farmers and Traders and Security National with respect to section 1129(a)(3), (7) and section 1129(b) is unnecessary. However, the Court notes that Farmers and Traders is correct in its assertion that the Debtor offered no evidence to support its contention that the increase of the interest on its indebtedness to Farmers and Traders from 9.75% per annum to 12% per annum, while extending the due date for the loan from 1990 to 2016, provided Farmers and Traders with a distribution with a present value at least equal to what it would receive in a Chapter 7 liquidation as of the effective date of the plan 11 U.S.C. § 1129(a)(7), or with a value as of the effective date of the plan, of at least the value of its interest in the estate's interest in the collateral, 11 U.S.C. § 1129-(b)(2)(A)(i)(II).

■ Since Farmers and Traders' loan is accelerated and over-secured, it has a right at the effective date of the plan to the unpaid principal plus any contract rate of interest that had accrued up until that time. *Cf. In re Monnier Brothers*, 755 F.2d at 1338. If it is to receive deferred cash payments over thirty years,

'The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the Court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of

the security and the risk of subsequent default.'

*Id.* at 1339, *quoting* L. King, 5 *Collier on Bankruptcy* ¶ 1129.03[4][f][i] (15th ed. 1985). The Debtor introduced no evidence that a 12% interest rate is the proper rate. Debtor's counsel averred that the market rate of interest was the appropriate rate and the 12% rate was utilized thereafter by the Debtor in its Feasibility Analysis. Although the Court does not dispute the fact that 12% may be an appropriate rate, the Court finds that the Debtor failed to meet its burden of proof on the issue, at least with respect to Farmers and Traders, due to the seemingly arbitrary selection of that rate by the Debtor without the submission of evidence relative to the prime rate, federal fund rate, discount rate, call money rate, etc. and to the appropriateness of the rate selected in view of risk of subsequent default.

In view of the foregoing, the arguments and memoranda of counsel and the entire record of the case, the Court hereby declines to confirm the Debtor's modified third amended plan of reorganization. The Debtor has thirty days in which to file, if it chooses, a plan (and an appropriate disclosure statement) that provides for the infusion of additional capital, the sale of the Debtor or its assets or substantial and material changes to the modified third amended plan.

## APPENDIX I

ATTACHMENT A

AGAWAM CREATIVE MARKETING ASSOCIATES, INC.
PROJECTED CASH FLOW STATEMENT
FOR YEARS ENDING 1985–1989

(12 MONTH ACTUALS)

|  | 12/31/84 | 12/31/85 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | | | | |
| Sales-Mailing | 99811 | 88446 | 92868 | 97512 | 102387 | 107507 | 112882 | 118526 |
| Sales-Data Processing | 38127 | 20321 | 21337 | 22404 | 23524 | 24700 | 25935 | 27232 |
| Sales-Printing | 367092 | 190339 | 199856 | 209849 | 220341 | 231358 | 242926 | 255072 |
| Income-T/W | 32059 | 53072 | 55726 | 58512 | 61437 | 64509 | 67735 | 71122 |
| Rental & Service Income-G&A | 17883 | 7488 | 7862 | 8256 | 8668 | 9102 | 9557 | 10035 |
| Sales-Creative/Graphics | 37117 | 69221 | 72682 | 76316 | 80132 | 84139 | 88345 | 92763 |
| Sales-Typesetting | 12002 | 24873 | 26117 | 27422 | 28794 | 30233 | 31745 | 33332 |
| Sales-Project Coordination | 12111 | 37832 | 39724 | 41710 | 43795 | 45985 | 48284 | 50698 |
| Sales-Project Coordination-AE | 13241 | 1781 | 1870 | 1964 | 2062 | 2165 | 2273 | 2387 |
| Media Placement | 17120 | 10142 | 10649 | 11182 | 11741 | 12328 | 12944 | 13591 |
| Sales-Retainer | 6400 | 5803 | 6093 | 6398 | 6718 | 7054 | 7406 | 7777 |
| Interest Income | 2 | 449 | 471 | 495 | 520 | 546 | 573 | 602 |
| Rental Income-Office & Warehouse | | | 34998 | 69996 | 42000 | 42000 | 42000 | 42000 |
| TOTAL REVENUES | 652965 | 509767 | 570253 | 632014 | 632119 | 661625 | 692606 | 725137 |
| **OPERATING EXPENSES:** | | | | | | | | |
| Regular Variable Expense | 288144 | 28266 | 29679 | 31163 | 32721 | 34357 | 36075 | 37879 |
| Regular Personnel Expense | 191571 | 233082 | 244736 | 256973 | 269822 | 283313 | 297478 | 312352 |
| Regular Equipment & General Supplies | 100679 | 158845 | 164049 | 169514 | 175251 | 181276 | 187601 | 194244 |
| Total Finance Expense | 4112 | 6992 | 7342 | 7709 | 8094 | 8499 | 8924 | 9370 |
| Total Marketing Expense | 2673 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Total General Expense | 130063 | 66220 | 69531 | 73008 | 76658 | 80491 | 84515 | 88741 |
| TOTAL OPERATING EXPENSES | 717242 | 493405 | 515337 | 538366 | 562546 | 587936 | 614594 | 642586 |
| NET INCOME (LOSS) | –64277 | 16362 | 54916 | 93648 | 69573 | 73689 | 78012 | 82551 |
| ADD: Depreciation | 57993 | 54761 | 54761 | 54761 | 54761 | 54761 | 54761 | 54761 |
| NET CASH SURPLUS TO FUND PLAN OF ARRANGEMENT | –6284 | 71123 | 109677 | 148409 | 124334 | 128450 | 132773 | 137312 |

ATTACHMENT B

AGAWAM CREATIVE MARKETING ASSOCIATES, INC.
RESTRUCTURED DEBT ANALYSIS FOR
THE PLAN OF ARRANGEMENT

| | | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|---|
| BEGINNING CASH POSITION | | 4820 | 672 | 23628 | 28687 | 15819 |
| ADD: CASH GENERATED FROM OPERATIONS | | 109677 | 148409 | 12434 | 128450 | 132773 |
| TOTAL CASH AVAILABLE TO SERVICE DEBT | | 114497 | 149081 | 147962 | 157137 | 148592 |
| CASH DISBURSEMENTS FOR: (1) | | | | | | |
| CLASS 1: | BARRON & STADFIELD | 4382 | 4382 | | | |
| | HALE & DORR | 15935 | 15935 | | | |
| CLASS 2: | FARMERS & TRADERS LIFE INS. CO. | 36756 | 36756 | 36756 | 36756 | 36756 |
| CLASS 3: | SECURITY NATIONAL BANK (FMHA) | 31994 | | | 19263 | |
| | SECURITY NATIONAL BANK | 8958 | 8958 | 8958 | 8958 | 8958 |
| CLASS 4: | JOSEPH TROWBRIDGE (TO UNSECURED) | | | | | |
| CLASS 5: | HBE LEASING CO. | 518 | 518 | 518 | 518 | 518 |
| | IBM CORPORATION | 112 | 112 | 112 | 112 | 112 |
| CLASS 6: | FEDERAL TAXES | 1105 | 1105 | 14244 | 16024 | 18027 |
| | STATE TAXES-DOR | 5646 | 11292 | 11292 | 11292 | 11292 |
| | STATE TAXES-MDES | 5726 | 11452 | 11452 | 11452 | 11452 |
| | REAL ESTATE TAXES | 2693 | 2693 | 2693 | 2693 | 2693 |
| CLASS 7: | UNSECURED CREDITORS | | 31250 | 31250 | 31250 | 31250 |
| | TOTAL DISBURSEMENTS | 113825 | 124453 | 117275 | 138318 | 121058 |
| | SUB-TOTAL | 672 | 24628 | 30687 | 18819 | 27534 |
| | EQUIPMENT REPLACEMENT | 0 | 1000 | 2000 | 3000 | 4000 |
| | ENDING CASH POSITION | 672 | 23628 | 28687 | 15819 | 23534 |

(1) For full description of debt and payment terms please see
MODIFIED THIRD AMENDMENT PLAN OF REORGANIZATION, dated March 20,1986.

ATTACHMENT C

AGAWAM CREATIVE MARKETING ASSOCIATES, INC.
COMPARATIVE BALANCE SHEETS
DECEMBER 31, 1984 AND 1985

ASSETS

| | 12/31/84 | 12/31/85 |
|---|---|---|
| CASH | $ 3577 | $ 4820 |
| ACCOUNTS RECEIVABLE | 30060 | 78346 |
| LOANS RECEIVABLE | 6800 | 6800 |
| INVENTORY | 21199 | 26315 |
| PREPAID EXPENSES | 1931 | 4904 |
| CURRENT ASSETS | $ 63567 | $ 121185 |
| PROPERTY, PLANT & EQUIPMENT (NET) | 255833 | 209349 |
| DEPOSITS | 9525 | 9525 |
| LOAN FINANCE FEES | 5782 | 4764 |
| MORTGAGE NOTE RECEIVABLE | 54852 | 54852 |
| OTHER ASSETS | 2809 | 2809 |
| TOTAL ASSETS | $ 392368 | $ 402484 |

LIABILITIES AND EQUITY

| | 12/31/84 | 12/31/85 |
|---|---|---|
| ACCOUNTS PAYABLE | $ 29722 | $ 23342 |
| ACCRUED EXPENSES | 14886 | 14896 |
| TOTAL LIABILITIES | $ 44608 | $ 38238 |
| DUE TO OLD ENTITY | 447773 | 447773 |
| TREASURY STOCK | −125 | |
| RETAINED EARNINGS | −99888 | −83526 |
| TOTAL EQUITY | $ 347760 | $ 364247 |
| TOTAL LIABILITIES & EQUITY | $ 392368 | $ 402485 |

ATTACHMENT D

AGAWAM CREATIVE MARKETING ASSOCIATES, INC.
12/31/85

ACCOUNTS RECEIVABLE AGING:

| CLIENT | 0–30 | 31–60 | 61–90 | 91–120 | OVER | TOTAL |
|---|---|---|---|---|---|---|
| BROOK SCHOOL | 252 | | | | | 252 |
| COMPUTER EMP | 172 | | | | | 172 |
| ESSEX GROUP FACILITIES | 989 | 320 | | | | 1309 |
| ECS & SUBSIDIARIES | 24060 | 7620 | 6343 | | | 38023 |
| GABRIEL | | 561 | | | | 561 |
| GOV DUMMER | 278 | | | | | 278 |
| INDIAN HEAD BANK | 456 | | | | | 456 |
| YIELD HOUSE | 3193 | | | | | 3193 |

ATTACHMENT D

AGAWAM CREATIVE MARKETING ASSOCIATES, INC.
12/31/85

| CLIENT | 0–30 | 31–60 | 61–90 | 91–120 | OVER | TOTAL |
|---|---|---|---|---|---|---|
| YORKSHIRE | | | 2715 | 31387 | | 34102 |
| TOTALS | 29400 | 8501 | 9058 | 31387 | 0 | 78346 |

ACCOUNTS PAYABLE AGING:

| CLIENT | 0–30 | 31–60 | 61–90 | 91–120 | OVER | TOTAL |
|---|---|---|---|---|---|---|
| ACME | | | 1282 | | | 1282 |
| ADP | 278 | 342 | | | | 620 |
| ADOLPH BAUER | | | | 1000 | | 1000 |
| BC & BS | 112 | | | | | 112 |
| BOSTON UNIVERSITY | | 2390 | | | | 2390 |
| BUSINESS INS | | 623 | 623 | | | 1246 |
| CAPE CODE COMPASS | | | 500 | | | 500 |
| CHICAGO TRIBUNE | | | 1472 | | | 1472 |
| ENTRE COMPUTER | | 2167 | | | | 2167 |
| ESSEX COUNTY GAS | 1284 | | | | | 1284 |
| HARTFORD COURANT | | | 305 | | | 305 |
| IBM | | 190 | | | | 190 |
| KIMBERLY ASSOC | | 439 | | | | 439 |
| NATL ADVERTISING | 420 | | | | | 420 |
| NATL UNDERWRITER | | 869 | 869 | | | 1738 |
| NE TELEPHONE | 2387 | 902 | | | | 3289 |
| NEWPORT DAILY | 205 | | | | | 205 |
| NS WEEKLIES | | 719 | 352 | | | 1071 |
| PITNEY BOWES | | 175 | | | | 175 |
| PROVIDENCE JOURNAL | 377 | | | | | 377 |
| ROWLEY LIGHTS | 820 | | | | | 820 |
| UPS | 42 | | | | | 42 |
| W OLIVER TRIPP | | | | 2198 | | 2198 |
| | 5925 | 8816 | 5403 | 3198 | 0 | 23342 |